We will hear argument first this morning in Case 2472, Hollyfrontier Cheyenne Refining v. Renewable Fuels Association. Mr. Keisler. Mr. Chief Justice, and may it please the Court, the statute establishing the Renewable Fuel Standard exempted all small refineries from its requirements for the first years of the program and authorizes them individually to seek extensions of that exemption at any time based on hardship. The question here is whether it prohibits EPA from granting a hardship exemption to a small refinery that hasn't been continuously exempt for all prior years. Respondents claim it does. Under their view, a small refinery can receive exemptions indefinitely, but only if it's never able to comply without hardship. If there's even one year in which it can comply without hardship, it's then disqualified for all future years. Nothing in the statute's text imposes this unique prohibition. Respondents' argument rests on the word extension, which they contend should be read temporally here to mean an increase in the length of time. But even if extension is read in its temporal sense, that does not require continuity. No dictionary defines extension to require continuity, and Congress has used the term elsewhere when it's specifically authorizing the temporal resumption of a benefit after a lapse. And where Congress has wanted to limit the term in the way respondents urge, it's added limiting words like successive or consecutive, which it didn't do here. A continuity requirement would also be contrary to this statute's purposes. The statutory design is to impose burdens that escalate dramatically over time. As the Department of Energy explained in 2011, some small refineries will face inherent and those mandates grow. Driving those small refineries out of the market would undermine the statute's energy independence goals, and that's one of the reasons Congress authorized them to petition at any time based on hardship. I welcome the Court's questions. Mr. Keisler, under your reading, which you extend means to grant, you know, you extend an offer or condolences. Could an entirely new refinery apply for an extension to it of a hardship exemption? In other words, coming onto the scene for the first time, they would, under your view, I think, have to ask for an extension. Yes, Mr. Chief Justice. If the Court adopted the make-available meaning of extension, then yes, a completely new refinery that came into existence after the initial period would still be able to seek an extension of the exemption. But the Court could also construe extension in the temporal sense without requiring continuity. And in that case, it's certainly arguable that a new entrant would not be able to get an extension of the initial exemption because it didn't have one without there being any requirement that the extensions have been continuously enjoyed by others. Well, which of those two readings of embrace do you think is the right one? If we were forced to choose, Your Honor, we would acknowledge that reading extension in that temporal sense without continuity would enable the Court to avoid having to decide whether this is one of those instances in which the same word has different meanings within the same statute. And so, for that reason, perhaps, that might be a preferred reading. But even in that circumstance, our key point would be that even the temporal meaning of extension does not require continuity. Congress has used it in exactly the other way multiple times, and no dictionary says that the temporal meaning of extension requires continuity. Well, it seems like you're sort of any port in the storm reading of this statute, and I'm not sure that's the strongest position. Well then, Your Honor, we would be happy to rely on the other construction of extension as well, because extension is often used when there is some preexisting separately authorized benefit, and it is being extended or made available to a different setting or time period or set of recipients, just like in 2015 when Congress enacted what it called an extension of Privacy Act remedies to citizens of certain foreign countries. It is a word that Congress often used when it is enlarging or extending the scope of a preexisting benefit, and we'd, of course, be happy with that reading here as well. Our principal point is that there is no basis under either reading to impute a continuity requirement to the word. So, this really is a freestanding exemption in your view, and I wonder, I'm not saying it's an inconceivable construction, but is this what you might expect if Congress were going to provide a freestanding exemption that they would do it in this sort of roundabout way? I don't think it's all that roundabout, Mr. Chief Justice. First of all, in subparagraph B3, that is exactly how Congress referred to this. It referred to the same petition and the same relief as simply a hardship exemption. It omitted the word extension entirely, which we think weighs strongly against respondents' effort to ascribe such a transformative meaning to that single word. In addition, this is a statute in which the obligations, as I said, intensify dramatically over time, and it seems implausible to think that Congress meant that merely being able to comply for one year in the early years of the program would mean that a small refinery would never warrant hardship relief ever again. Counsel, I think you would agree that there's no Chevron deference issue here because the agency has changed its position. Is that right? Well, we don't agree with that, Your Honor, although of course we think the statute should be construed the way we urge without regard to Chevron. We do think that there is deference here because EPA adopted this interpretation in a notice and comment rulemaking in 2014, and it hasn't changed that rule. Well, the agency doesn't abide by the same position. Are you saying it didn't do that through notice and comment? Well, that's part of it, Your Honor, but it's also the fact that these are agency adjudications. We filed our petitions under the existing rule, and that rule has the force of law if it's lawful, and under Chevron, it's lawful if it either implements the clearly expressed intent of Congress or reasonably resolves statutory ambiguities. Thank you, counsel. Justice Thomas? Thank you, Mr. Chief Justice. Mr. Kessler, the Chief Justice has covered most of the ground I was interested in, but I am interested in this. For you to prevail, would your reading have to be the more normal reading of extension or simply one possible reading of the word extension? I think I would perhaps put it in a third way, Justice Thomas. We think it is the best reading of the word in the context of this particular statute, both the other text, like the words at any time, and the statutory purposes I alluded to earlier. Even if there was some tiebreaker needed, we would then say that, as I just indicated, we think Chevron deference should be accorded to the earlier 2014 rulemaking, but we don't rely on that because we think we are urging the best reading of the statute. This seems a little bit odd to think of an extension for something that is already terminated. You know, if I were to lose, if my electricity is turned off because I failed to pay a bill, and then I paid it, or I get a reprieve, is that an extension or is that a grace period? It just seems rather odd to read it that way. I think this is a word, Justice Thomas, that's highly sensitive to context, and I think there are certainly some contexts, like the one you just mentioned, in which one wouldn't think of what we're talking about as an extension. But here, in the context of government benefits that lapse and then resume, Congress has specifically used the word extension to describe a resumption after a lapse. It did so twice, because this has been happening recently in light of the pandemic, where Congress has resurrected benefit programs that had previously lapsed, in one case more than six years ago. And in each of those cases that we described in our brief, Congress labeled the resumption of a program that had been lapsed and unavailable, in one case for a period of years, as an extension of that program. So we think the context to focus on here is the one in which Congress is acting on benefit programs that have lapsed. And there, Congress has said, benefits resumed after a lapse can be an extension. In addition, as I indicated, where it has wanted to limit the word extension to be only continuous, it has felt the need to add words like consecutive or successive. Consecutive extensions, or extensions for successive periods. And under Respondent's view, all of the many statutes that talk about extensions for successive or consecutive periods, the words are all surplusage. Along that line, how much weight do you put on the phrase, may at any time? I think it's a very important phrase, Your Honor. That is the broadest possible temporal language. And it is inconsistent, we think, with any understanding of subparagraph B that treats it as transitional or temporary or designed to sunset. Subparagraph A is captioned temporary. Subparagraph A is filled with time limits and deadlines. But Congress then broke this petition process out into a separate subparagraph B, lacking the word temporary, lacking all those temporal words, and including the broadest possible temporal language at any time. And we think what that signifies, Your Honor, is that these two subparagraphs are dealing with two periods. Subparagraph A with the initial periods of the program in which initial broad relief was applied to everybody. And subparagraph B, reserving the right to give relief to individuals with hardship as the demands of the statute ratchet up. Thank you. Justice Breyer? Good morning. The other argument that was, I believe it's in the lower court, that the respondents make is Congress had a good reason for making this a single connected exemption. They wanted to phase out the exemptions over time. And gradually, if this exemption would end, as it would, or become narrow under their interpretation, it would, there would be fewer and fewer companies that were exempt. And that would mean more and more would have to figure out some way of making do with the program. And that's what they wanted. But what's your response? Well, those are the two competing narratives of what is going on here, Justice Breyer. We have said the provision is meant as a safety valve for when hardship occurs as the demands of the program ratchet up. Our friends on the other side say it was supposed to be a funnel, one which actually would funnel some small refineries out of the market to the comply. And we think there are several reasons why the safety valve and not the funnel metaphor is right here. First of all, as I mentioned a moment ago, this is a statute in which the burdens escalate over time and the petition is supposed to be based on hardship. Seems implausible to think that Congress would assume that an early ability for a year to comply would mean there would be no need in the future. Second, the purposes of the statute are all served by our interpretation because Congress wanted both to ensure that the volume requirements of blended fuel are met and that small refineries are protected. And EPA now has an approach in which it will slightly increase the applicable percentage to take account for the projected small refinery exemptions in the next year. That means that every goal gets served, the small If respondents' interpretation is adopted, you will force some small refineries out of the market, which is a kind of contraction of refining capacity that doesn't serve Congress's energy independence goals, but you wouldn't get a single drop of additional fuel blended. And finally, the anomalies I referred to in my opening statement, similarly situated refineries, both facing identical hardship, get treated oppositely because one of them several years ago, when the statutory demands were lighter, was able to comply. Or the refinery that is never able to comply without hardship gets exemptions indefinitely because they're continuous, but the refinery that occasionally can comply is driven out. None of that we think commends respondents' view of this statute. We think it is a safety valve and not a funnel. Thank you. Justice Alito? Well, Mr. Keisler, you and the respondents have different accounts of the purpose of the Act, but it's always difficult to interpret an Act in light of its purposes, because Acts serve multiple purposes. So let's put that aside and look at the text. You're right, extension can mean two different things. It can mean what you think it means. It can mean what respondents think it means. I don't know whether that's a wash, but both of those are possible. The best textual hook I think you have is the at-any-time argument, but there are some other accounts of the role that that's supposed to play, the role that it plays, and I'd appreciate it if you would address those. One is that it meant to indicate that a small refinery can seek an extension after the finding that's made on November 30th. Why isn't that a plausible explanation of its meaning? Well, I think that is certainly one scenario, Justice Alito, in which it would be applied, but it is a very narrow and specific focus and limitation for the broadest possible temporal language possible. You know, the Tenth Circuit said that, well, it says you can file it at any time, but that doesn't mean it can be granted at any time. Yeah, I know. Let's put that one aside. But what about the November 30 deadline? So it's narrow, but it's a possible explanation. Well, I don't think it's a full and sufficient explanation, though, because under the Court of Appeals' view, the ability to file a petition that can be granted ceases once a small refinery has had one good year. That's not at any time. So it's not simply that respondents have a view that attributes only a very narrow purpose to the broadest possible language. It also cuts out some obvious applications of that language when Congress has said these petitions can be filed at any time based on hardship. Let me come back to the question you were talking about with the Chief Justice, and that is whether a small refinery that did not get an exemption under A could ask for a hardship exemption under B. How is that possible? Because the first part of B says a small refinery may at any time petition the administrator for an extension of the exemption under subparagraph A. So why doesn't that mean that the refinery must have had one under A in order to ask for one under B? I think that is one reading, Justice Alito, but not the only necessary reading. If it were that reading, all of the refineries here would still get the extension because they all had the initial exemption. But with respect to the specific question, if one reads extension as make available, the way we talk about extensions of credit or extensions of other government benefits, then you wouldn't need to have had an exemption under subparagraph A to get an extension of that exemption. Because as I mentioned earlier, extension is often used when there's a preexisting benefit that is then being enlarged with the scope being provided to some new set or new setting. And here, what that phrase would mean is that the terms of the exemption in subparagraph A, which is where it's defined as the requirements of paragraph 2 shall not apply, the terms of the exemption in subparagraph A are being extended to the petitioning small refinery. What do you think is, suppose you're right that the exemptions don't have to be continuous. What do you think is the standard that the EPA is to apply under B? I don't really see any standard. To what degree is this purely a matter of EPA discretion? I think it is limited, Your Honor, by phrases like disproportionate economic hardship. Disproportionate in particular requires the EPA to find that the small refiner in question is experiencing some type of disadvantage or hardship that is distinct from simply what anybody else in the market might be experiencing. And the reason Congress established these separate provisions is that it understood that small refineries have several inherent and structural disadvantages that set them apart, and that can, in certain circumstances, give rise to a level of hardship from compliance here that far exceeds those of their larger competitors. Thank you. Justice Sotomayor? Counsel, just for me to be sure or clear, I thought the circuit below disagreed with your interpretation of what economic hardship means. I thought the circuit below thought that it meant you had to have a particular hardship relating to blending the fuels or buying the credits. Am I wrong about that? No, you're right, Justice Sotomayor. The lower court felt that the EPA had not applied a strict enough causation standard because it took into account both the fact that the market was experiencing a difficult year combined with the individual circumstances of the small refinery and the cost it had to bear in complying with the statute. So your answer to Justice Alito basically means that there's still a fight. There's still a dispute going on below. Yes, Your Honor. There's going to have to be a dispute. I'm not saying that the 10th Circuit can be addressed by EPA, but if the 10th Circuit is affirmed, there'll be no remand because we'll just be statutorily foreclosed from relief. Now, secondly, you keep speaking about how Congress has acted in other statutes, other relief statutes that it's given at different times. But let's look at this particular one. Is there any use of the word extension anywhere elsewhere in this statute that doesn't have a temporal continuity meaning? Yes, Justice Sotomayor. What other section besides the one at issue? Section 07E3, which we address in footnote 7 of our reply brief. That's the waive certain requirements for up to 60 days. And then E703 says that in the event that disruption is continuing beyond the expiration of that period, it can be extended for up to another additional 60 days. EPA certainly doesn't have to make the determination that it is continuing beyond the initial 60-day period after it's expired, but it certainly can. And if it did, the extension would be non-continuous. The other uses of extension in this statute, I would acknowledge, Justice Sotomayor, are continuous, but they're continuous because of features about those provisions because they all involve extensions of an effective date when some requirement will first take effect. And of course, if an effective date is extended, it has to be continuous because otherwise it wouldn't work. Well, counsel, I guess my biggest problem is that you say in context, we should read this differently. And you're talking about the two interpretations, the competing interpretations of what the purpose might be of this statute. But doesn't the use of the word temporary in the provision at issue suggest the other side's reading more than yours? I don't think so, Your Honor, because as you just said, temporary is in the other provision, in subparagraph A. And subparagraph B not only lacks that word, it says the opposite. It says it any time. And I would just add— The problem is that B defines what A—defines A, and A is where you get the extension at all. Yes, but I don't think that means that subparagraph B carries over with it every aspect of subparagraph A. For example, the extensions are going to be of different duration. There are all sorts of different terms about when they will be provided and what conditions will be appended to them. So I think we understand subparagraph B as linked to subparagraph A in some respects and delinked in others. It's linked because it is talking about the same relief, the same defined exemption from the requirements of subparagraph 2. But it is delinked because it's not temporary. It's at any time. One last question. On your alternative reading, the one that you suggested to the Chief Justice, if we were to accept that extension doesn't require continuity, wouldn't that result in the—and I think you acknowledge that small refineries that came into the scene after 2006 could never receive an exemption, correct? Under that reading, yes, Your Honor. So under that reading, basically it is a sunset reading of this provision. Well, I don't think it's a sunset because the provision would continue to be available to everyone who was there when the program started. But yes, if you newly came into existence as a small refinery, you would be ineligible. And for what it's worth, EPA in 2016 suggested one reason why that might be so. It rejected a continuity requirement, but it did say that new entrants shouldn't be able to get an extension. And they said that was because a new entrant comes into the world knowing this program exists and can have planned for it rather than one who had it foisted upon it. Thank you, counsel. Justice Kagan? Good morning, Mr. Keisler. In thinking about the ordinary meaning of this word, extension, I guess I'm wondering if you would comment on this hypothetical. Suppose that I rented an apartment five years ago, and I rented it for a year, and then I decided to give it up. And five years later, I'm now really tired of where I'm living now, and I want to move back. And I call the landlord and say, I'd like an extension of my lease. What would the landlord say? I think the landlord would scratch her head and think that's a very good extension. I agree with that. And that I think is like the government's examples of the hotel guests or the people parking their cars. I think those may have a different connotation in part because they involve rights of physical occupation, and because you go away and you then come back, and we think of that as discontinuous. And that's why we think the much more apt context here is how Congress has used the word in the context of government benefits and programs that existed, lapsed, and Well, Mr. Kressler, I mean, let's think about it in this particular context. So there's a small refinery, and let's say that its initial exemption ended in 2011. And since then, it's been able to meet its renewable fuel obligations, and indeed continues to do so for decades. And then in the year, you know, 2040, 30 years later, it runs into problems, and it files a hardship petition. And you're saying that in this context, it's any more an ordinary use of the word extension to say that after that 30-year lapse, the small refinery gets its extension? We would, Your Honor. And while that's an extreme example, we think it is still more in keeping with the statutory purposes and text to permit the small refinery in Your Honor's example to petition at any time. I mean, I understand your argument about purpose, but I'm just trying to focus on the text here. And I guess, I don't know, explain that textual analysis to me. Well, I think it's a couple of things, Your Honor. First of all, the text says at any time. And second of all, while the hypothetical is extreme, and I think probably highly unlikely, it is, we think, no less extreme and much more contrary to the text and purpose to say that a refinery which had one good year in 2013, when the requirements of the program were so much more modest, somehow is foreclosed in 2016, when it faces real hardship. Well, I understand your purpose argument, but I wouldn't think that that's a problem with the resumption, or a renewal, or something else. But it doesn't seem really like an extension. Well, I think it is an extension, Your Honor, in the same way that Congress has used extensions in the other context I've mentioned. And I think that is fortified here by the fact that this extension can be sought at any time, and that the relief is described in paragraph B-3 as simply a hardship exemption without even using the word extension at all. Well, thinking about that at any time language, Mr. Kaiser and Justice Alito talked about this too. And, you know, of course, that seems very general language. But if you look at this provision, it essentially says, look, you can get your extension by way of this study. Or then even if you're not identified in this study, you can petition for an extension at any time. And you can do that even after the EPA determines the upcoming year's obligations. And you can do it even after a compliance year. So even after the year goes through and you haven't met it, and you're kind of asking for a backwards extension. So that's a lot of at any time to give meaning to that phrase without distorting the word of extension. Without distorting the meaning of the word extension, isn't it? Well, I think it is some applications of at any time. But it would also be the case that there would be some instances in which the refinery couldn't petition at any time, in particular, any time after it had one year in which it could comply without hardship. So I think Your Honor's interpretation permits them to do it at some times, but not at any times. And I suppose I would just quarrel with the premise of the question that interpreting at any time in its natural way requires a distortion of the meaning of the word extension. Extension is a word of many meanings, and it is frequently used in statutes the way we are recommending here. You said frequently, but I think your brief only really has these two COVID examples in it. I mean, if you had written this brief last year, you would have had no examples. Well, I think the pandemic is what's given rise to the need for Congress to resume programs that had previously let lapse. But it's not just those two examples, because we also think it's telling the negative examples we've described, in which when Congress has wanted to define extension so as to impose a continuity requirement, it's used additional words like successive or consecutive, which under respondents' reading are all surpluses. Thank you, Mr. Keisler. Justice Gorsuch? Good morning, Mr. Keisler. You acknowledged in your briefs that extensions under A22 are likely to be continuous during that first period of time, during the first five-year period. But you suggest that it is at least possible that they might not be, that there could be discontinuity there too, which would I just want to explore that argument a little bit further. It's footnote six of your reply brief. How do we know that the definition of small refineries would be applied and measured for each calendar year during that first five-year period, rather than only once when the initial exemption was required? Well, the question didn't come up, Justice Gorsuch, so I suppose we can't know for certain. But the way the statute defines small refinery, it says that you have to meet the 75,000-barrel daily throughput put for a calendar year. That at least suggests that it was talking about an individual year. So a refinery which started out as a small refinery and then in 2010 grew beyond that definition, we think wouldn't be a small refinery in 2010 and wouldn't have been entitled to the blanket exemption for that year. Do we know for a fact whether that ever happened, whether that small refineries, some qualified initially and then didn't qualify later or vice versa during that first five-year period? I don't know whether that happened during the first five-year period. I do know that refineries have grown and shrunk in general beyond and within that definition during the broader life of the program. And has EPA treated them as small refineries during some periods and not others? Well, yes, because their current regulation, the one that was adopted in their 2014 eligibility rules, specifically says that the relevant year when a small refinery is applying is the year for which it's seeking the exemption and the immediately prior year. So it wouldn't matter under that regulation whether you were a large refiner in earlier years. Has EPA disavowed that aspect of its regulation? Not that I know of, Your Honor. Thank you. Justice Kavanaugh? Thank you, Chief Justice. Good morning, Mr. Keisler. I want to explore with you the relevance, as others have mentioned, of the at-any-time language and just get your sense of how that works here. I guess what you're saying is the word extension, under your temporal extension argument, could be read in one of two ways. It could be read to require continuous. It could be read to not require continuous to get the temporal extension. And that we have to look at other clues in the text of the statute before we get to the purposes. And I'll get to that. But before we get to the purposes, we look at other clues in the text. And at-any-time is your hook. Justice Kagan and others have pointed out that you don't necessarily have to read it that way. And I just want to get your kind of full understanding of how at-any-time works here. And are there any other textual clues that would tell us whether to read extension as continuous or not requiring continuous? Yes. Thank you, Your Honor. I think at-any-time is best read as the most expansive possible temporal language, which is meant to ensure that as the demands of the program escalate, the safety valve will be there such that a small refinery that newly experiences hardship can obtain relief at any time. And as I said, the contrary view really doesn't give at-any-time the broad meaning the text demands, because it says that once you've had one good year, you're out. And that's not at-any-time. And that's why we say that the statute is designed for two different periods, subparagraph A for the temporary initial period and subparagraph B for when individualized relief is necessary thereafter. As to other textual clues, we think there are several. First of all, there is the contrast in the language between subparagraph A and subparagraph B, one that has subparagraph A that has temporary and all these time limits and deadlines, and subparagraph B, which has no temporal language other than the most expansive possible at-any-time. And second, there is the subparagraph 3 reference to a hardship exemption. This talismanic word extension is suddenly eliminated when Congress restates the same petition and the same relief, which at a minimum says respondents are giving much more weight to than Congress did. And finally, other textual aspects of the statute. This is a statute which textually commands that the burdens will intensify year after year after year and textually says that relief is to be given based on hardship. And it does not seem a sensible reconciliation of all these provisions to say that that text and the underlying purpose it indicates would be served by kicking out a small refinery from eligibility for exemption because in one early year of the program it was able to comply without hardship. And I understand your argument today to be focusing much more on the second argument in your brief, the temporal extension, than the first argument in your brief, which I think is probably wise. I understand why you did it in your brief, but is that correct? Do you think that second argument is actually a stronger argument for you? Well, I'm cognizant of the fact that the Chief Justice implied the opposite in his question, but I certainly think that the second argument avoids some of the trickier aspects of the statutory construction analysis because at least means this isn't an example in which the court has to decide whether the word extension, which we admit is used temporarily in other provisions of the statute, is used in a different sense here. Then I want to just focus on how the separation of powers angle fits in with the real-world effects of how this program works. Under the other side's reading, Congress has eliminated the possibility of an exemption if a small refinery ever in a particular year didn't get it. Under your view, it's not automatic that you get the exemption, right? It's up to EPA. Is that correct? That's correct, subject, of course, to judicial review under the EPA. Okay, and I understand your further point to be if a small refinery is having significant economic hardship in a particular year, the question is, did Congress want—this is more of a purpose argument—but did Congress want EPA to be able to give an exemption in that year, or did Congress want the small refineries to go out of business? Is that a fair way of putting your argument there? Yes, Your Honor. Okay, one last question. EPA doesn't usually set its renewable volume obligations on time. I had a lot of experience with that in my past judicial posts. Does that affect anything here? I think only in the sense that it gives further credence for the reason that Congress would want these to be sought at any time, because not only does EPA frequently miss deadlines, it has sometimes been reversed for applying too strict a standard. And that means that if a small refinery, say in 2015 or 2016, didn't apply because EPA was applying too strict a standard in understanding disproportionate economic hardship, and then it got reversed by a court, but all of those small refineries who didn't apply or were denied wrongly would then be out of the program as well. So it gives extraordinary weight to the artifacts of what can be quite random decisions by EPA. Thank you. Justice Barrett? Mr. Keisler, do you think that a refinery's request for an extension has to have anything to do with the reasons why it received a prior exemption? In other words, even if there's not a required continuity of time, that there would be some sort of continuity of reason for the exemption? Well, I think certainly any application that it made would have to be factually consistent with representations it made before, and it would be painting a picture over time of its economic circumstances. So in that sense, there would need to be consistency over time, but the actual application would focus on what the circumstances of the refinery are for the year for which it's seeking an exemption, we think. But if there are new circumstances, why wouldn't it be more natural to say that the refinery is seeking a new exemption? Well, if one were to take that view, then that would be the way Paragraph B3 describes it as simply a petition for a hardship exemption. But it is also within the meanings of extension that we have described, an extension of the exemption under subparagraph A, because it is a lengthening of the overall period for which that exemption was in effect, and it is also extending in the make-available sense that exemption from A into this different setting of a new hardship petition. Justice Kagan gave you an example in which she posited seeking an exemption in the year 2030, you know, that this could, this at-any-time language could be stretched pretty far. But you know, under B, it relates back to this, in A, the 2008 study that the EPA is supposed to conduct to determine whether compliance would create a disproportionate economic hardship on small refineries. If there's no continuity of time requirement, it seems that the temporal connection between that 2008 study and what might happen in 2015, 2020, 2030 gets pretty severed, so that there's no connection. Can you say what role the 2008 study would play in your view? Yes, Justice Barrett. The 2008 study wasn't only about picking the 13 small refineries that were going to get the additional two-year extension. More broadly, it laid out a whole framework for understanding what the economics of the industry were, what the factors were that DOE at least would consider in deciding what to recommend, and it developed a whole scoring matrix based on capital requirements and financial condition and operating margins and things like that. That's what EPA and DOE look to from that study to determine exemptions going forward, and that would still be applicable in 2030 or 2040. And I would just add, if you did have an application filed in 2030 or 2040 for the year 2015, we do think at-any-time would mean that EPA couldn't just dismiss it as time-barred, but that doesn't mean EPA couldn't take into account the fact that it took 20 years to file that application in thinking about whether the representations were credible and whether the evidence was sufficient. Let me shift gears and see if there's another provision in the statute that might help you. Section 7545.07a allows the EPA to waive the RFP requirements upon a finding that they would I could imagine a small refinery, if it were struggling or if it were going to be forced out of business, that that might harm the economy of a region. Is that a provision that might help you? Well, we think it's directed to a slightly different circumstance where there needs to be a broader reduction in the applicable requirement that applies to the industry as a whole when there would be harm to a region or a state or the whole country. And I think it does help us some because it shows that Congress wanted to permit EPA to be sensitive to these market conditions. But the key thing is that the small refinery provisions are the only ones that are geared to an individual company and its circumstances. So the broader authorities don't deal with that problem. And the reality is that you can administer a program more forcefully overall if you have the ability to exempt the smallest and most rather than letting the concern about driving them out of the market drive the whole program. Thank you, Mr. Keisler. A minute to wrap up, Mr. Keisler. Thank you, Mr. Chief Justice. I'd just like to add that respondents' interpretation is especially implausible given the structure it would impose. My friends say that these provisions establish only a limited transitional period, but they've identified no other statute with there's no defined number of years. It instead ends on different customized dates for each small refinery, depending on when that refinery first happens to be able to comply, even if it can do so only for one year. That's what gives rise to all the anomalies of similarly situated refineries being treated differently. And it's especially implausible that the one and only statute which would structure a transition period in this way would be the one in which the demands are designed to increase substantially over time and which authorizes small refineries to seek relief at any time based on hardship. Thank you, counsel. Mr. Michel. Mr. Chief Justice, and may it please the court. Under the key provision in this case, a small refinery may seek an extension of the exemption under subparagraph A. The meaning of that language is straightforward. If a small refinery has an exemption under subparagraph A, it can obtain an extension of that exemption from EPA. But if a small refinery no longer has the exemption, it cannot obtain an extension. EPA cannot grant something that does not exist. That is the ordinary common sense meaning of the statutory text. It gives the word extension the same meaning in adjacent interconnected clauses. And it reflects the statute's objective to boost production of clean renewable fuel while providing transition time for small refineries to comply. Although the government endorsed petitioner's alternative readings below, EPA now agrees that the Tenth Circuit correctly rejected them. Petitioners first proposed that extension in the key provision means grant. But the statutory context forecloses that reading. The subject of the extension at issue, the exemption under subparagraph A, cannot be granted anew. It can only be lengthened in time. Petitioners alternatively contend that extension has a expired exemption. That defies the ordinary meaning of extension. In common parlance, it would be awkward at best to seek an extension of something that has lapsed, especially if it were described as temporary. Simply put, if Congress wanted to adopt the generally available exemption petitioners advocate, it would not have enacted the scheme it did here. That scheme does not doom small refineries to failure. The vast majority of small refineries, including petitioners, have successfully complied with the RFS in many prior years. This statute creates flexibility to facilitate ongoing compliance, and other tools exist to address other challenges. But the Court of Appeals correctly conscripts us through the provision at issue here, and its decision should be affirmed. Mr. Michel, this is a hypothetical rich case. Everyone's different scenarios where extend or deadline for a term paper. It would be normal language for you to go into the professor and ask for an extension. You wouldn't go in and ask for a new deadline. Given all those hypotheticals, both along those lines and the other way, you're not arguing that this term is plain or unambiguous, right? The terms you used in your opening were straightforward and ordinary. But it's not plain or unambiguous, is it? Mr. Chief Justice, we're not arguing that it's unambiguous, but we do think this is clearly the more ordinary use of the term in common parlance. And we think that the court's decisions have said it will apply the ordinary meaning of a statute unless there's a good reason not to. And we think there's no good reason not to here. Your friend's interpretation on the other side is one that would be upheld, right, if Chevron deference applied? If Chevron applied, I think that would be correct, although I think there are a lot of reasons why Chevron doesn't apply, starting with the fact that the rule my friend cites does not actually contain any interpretation of the question presented here. He's relying at most on an implicit assumption in the preamble to the rule that leads to a position EPA no longer has. And I don't think there's any case in which the court has granted Chevron deference to something like that. And you're not arguing for Chevron deference going your way either, right? We are not, Mr. Chief Justice. So that leaves us with the obligation to look at all the available evidence of congressional intent. I think that's right. And I would just start with what we think is the ordinary meaning of the term. I also think it's highly significant that that's how Congress used the term extend in subparagraph A clause 2. I think my friend admits that that term is used there in a way that requires both temporal existence and continuity. And this is about as close a case as you can imagine for consistent meaning, given that A2 and B1 have the same title, address the same subject to the same entity, set the same standard, and expressly cross-reference each other. I want to get back to a point Justice Kavanaugh made, that the debate here is about whether or not the small refinery can get in the door. In other words, it doesn't automatically get an extension. It just authorizes EPA to grant an extension. And why wouldn't that be something that suggests a broad meaning of the availability of an extension? So a couple of reasons, Mr. Chief Justice. Just looking at the structure of the statute, Congress, of course, labeled this a temporary exemption. It provided for increasingly narrow mechanisms of extension. If you look at A2 and then B1, you can actually see the funneling effect. It goes from two years to an unstated period, which EPA has considered to be one year. And if you look at the other waiver provisions in the statute, they're also relatively narrow. Thank you, counsel. Justice Thomas? Thank you, Mr. Chief Justice. Mr. Michel, just a couple of brief questions. The Secretary, let's say, going back to a point that Justice Kavanaugh made, that was often late in completing its work. And here, I'm particularly interested in the study that it was required to have done by the end of 2011, or the beginning of 2011. What if it were late and the temporary exemptions expired? Then it implemented the rule, let's say, provided for the extensions a month later. Would those be considered extensions or renewed? How would you deal with those? Justice Thomas, I do want to stress the study was completed in time, and so all of these extensions under A2 were, in fact, continuous as a practical matter. I think your question really highlights that Congress expected them to be continuous as well because the study was due at the end of 2008 and the initial exemption extended through the end of 2010. I have to confess, I'm not sure I've thought about what would have happened in the hypothetical world if EPA had not, or if DOE had not gotten that study in on time and the initial exemptions had lapsed. I do think that would not be the ordinary meaning of extension. And then the question would be whether the context of the extensions that you'd have to look otherwise, but I don't think that that's presented here. In your definitions that you provide for extend and you brief, they seem to assume words like continuance or continuation, which seem to suggest that at some point there was a termination or an extension. Justice Thomas, I think there's a definition on page 66A of the Court of Appeals opinion that does include the word continuity, but I'm not sure the dictionary is a complete solution here. What we're relying on really is more what the Tenth Circuit called dictionary definitions plus common sense. I think Justice Kagan's example was a good one. There were many extenders say for a discounted rate and you said, well, great, we'll come back in three years. I think they would say that's not what we mean by an extension. And I think that's by far the more natural understanding of the term in common parlance. So do you think, do you agree with petitioner that it's context specific or that context is very important? Absolutely, Justice Thomas. And that's why I think A2 is so important here. I mean, that is by far the most closely related provision in the statute and it requires both a temporal extension and continuity. Thank you. Justice Breyer. Good morning. I mean, you're talking about common sense. This is a marketable rights program, isn't it? I think it is. And they sell the rights to pollute more, you know, use less ethanol in the marketplace. As I read it, it's a classical such program. The characteristic of such program compared to a tax is with a tax, you know, the price, but you don't know the amounts. Marketable rights, you know, the amounts, but you don't know the price. I think anybody would have knowledgeable would have thought that from what I've read here. And so no one would know if we go out two or three years, which small refineries will find hardship and which won't, and it'll change from year to year or two years to two years. And it would be to me a very peculiar statute, which gave rights in such a way that when it changes as it will change all the time in and out, in and out, in and out. And they don't know who they're giving it to and they don't know when they'll qualify and they might qualify time A and time B. And so from the point of view of a marketable rights program, your interpretation seems to turn it into a kind of chaos. Now, what do you say? Well, I don't think there's chaos here. There was of course, complete clarity that the blanket exemption was available for the first five years. That wouldn't help. It wouldn't help, you know, because six years out, the price of getting the marketable right goes up 30%. And now a whole new set of refineries qualify, or it goes down 50%. And then those are the ones who have been getting it are out because they're not in hardship anymore. I mean, that's normally the way such a program works. Maybe it didn't work that way here, but you're the one who would know, which is why I bring it up. Right. So Justice Breyer, a couple of points. I think if Congress wanted to create a freely available exemption that would serve the purposes you've just described, it would have done what it did in subsection 07. That was the section that Justice Barrett mentioned to my friend at the end of his argument. That allows for a freestanding waiver of the volume requirements. And Congress instead took a much more roundabout path here by creating the initial blanket exemption and providing for- Why is that roundabout? As you read it, I understand how you read it, but it seems to me paragraph A1 could be read as follows. Temporary exemption. The requirements of paragraph two shall not apply to small refineries. That's the exemption until calendar year 2011. That's the temporary. Okay. And now we go down to the next one and it says where there's economic hardship. What will happen is the requirements of paragraph, where there's a study, and then it says that the exemption under clause one, two more years, the exemption was paragraph two didn't apply. And then it says later the exemption of paragraph A will apply where there's disproportionate hardship. I mean, I don't have a problem reading it that way. You could read it many ways, but that seems reasonable. So Justice Breyer, I think the big problem with that is that you're cutting out until calendar year 2011. Sure, that's the temporary. The sentence describes the temporary exemption. The exemption is what they say. You don't have to use your exempt. I think the problem with that reading though is that in B1, it directly references it back to the exemption under subparagraph A. And there's simply no language in subparagraph A that can be freely granted. If Congress wanted to do that, it would have done what it did in subsection 07, where it said exactly what you just said, which is a refinery can petition for a waiver of the volume requirements. Justice Alito? My concern here is exactly what you've been discussing with Justice Breyer, or at least it's along the same lines. Is it true that the price of RINs fluctuates quite a bit? It is, Justice Alito. All right. Well, tell me why the scheme then that you're proposing is one that Congress would think is sensible. If a small refiner is able to comply for a number of years, but then is unable to comply because of the fluctuation of the price, but would be able to comply again after that year, why would Congress want that small refinery to be forced out of business? Justice Alito, I do want to make clear that we don't think they'll be forced out of business. And I think that's an important point because that would really raise the stakes beyond where they actually are. I also think it's important to note that EPA's longstanding position is that a refinery can recover the cost of compliance through this RIN program. But even if you didn't accept either one of those, at the end of the day, this is a statute that's aimed at transforming the fuel supply. And ultimately, it is necessary to bring all of the small refineries into compliance. That's after all, I think, what Congress meant by a temporary exemption that can be extended only under certain circumstances. So you think this is a sunset provision? I think it's in some ways a particularly generous sunset provision in that the five years is the only clear sunset after 2011, but then small refineries that can show they need it for longer can keep it for longer. The ultimate result is, I think, something of a sunset, but that's exactly what you would expect from a temporary exemption. Well, if it's a sunset provision, isn't it a rather strange type of sunset provision? I've never seen a sunset provision like this. Well, I don't think it's a sunset provision in those terms, but there are other areas of the law where someone can continue to receive exemptions or extensions of a particular status. Visas, for example, you can come into the country on a visa and continue to extend it. And you might say that that's a sort of sunset program in the sense that once you no longer continue to obtain the extensions, you're sunsetted and it'll happen at different times for different people. I don't think that's a particularly unusual concept. What do you think is the standard that the EPA applies under B? So it's disproportionate economic hardship. What about, what are these other economic factors? So that, you know, I think that just indicates that the EPA can look beyond the four corners of the DOE study. And I think in the sealed appendix, there's a pretty good look at what EPA looks at. It's a wide variety of financial information, but ultimately it's geared toward determining whether the small refinery has disproportionate economic hardship. How do you assess or decide that the number of extensions or exemptions has varied quite a bit from year to year? So Justice Alito, quite candidly, as we mentioned in the brief, there were a number of statements by individual members of Congress or committees of Congress that said in pretty clear terms, they wanted more extensions, the exemption and EPA, I think, complied with that. And it took this litigation, which was the first litigation presenting this question for the 10th circuit to come in and read the statute according to its text and persuade the agency that it actually couldn't do what it had been asked to do so many times. Justice Sotomayor? Counsel, I'd like to go back to something you said to Justice Alito. You said that this is not going to cause small refineries to close. Please explain why. Sure, Justice Sotomayor. I think if you look at the history of the RFS program, the vast majority of small refineries have complied for many years, including petitioners in this case. And that includes years in which they have sought hardship relief under this provision and had it denied. EPA denied about 18 petitions between 2013 and 2015. And as far as we know, only one small refinery went out of business after that. It's also notable that other refineries that don't fall underneath the 75,000 barrel per day threshold that's in the statutory definition for small refinery have complied all the way back to 2006. And that's true even of refineries that have 80,000, 90,000, you know, throughput that's not all that different. And it doesn't really present qualitatively different economics than the refineries face here. And finally, there is flexibility built into the RFS program. As we've mentioned, there are waiver authorities, Justice Barrett cited one. There's also an important provision in O5D that allows a small refinery to carry over a deficit. In other words, falling short of its volume requirements for one year. So if there's a particularly hard year, they can rely on that. I'd also note the Energy Policy Act that adopted this, the RFS had other provisions that help refineries, including small refineries and getting special access to oil from federal lands. And of course, we are sensitive to the COVID-related hardships that small refineries are suffering. But the federal government has expended a lot of COVID relief that can help them in their capacity as businesses, and maybe more importantly, stimulate the economy to boost demand for fuel, which will help them going forward. Thank you, counsel. Justice Kagan? Michelle, in thinking of your conversation with Justice Breyer, I mean, it strikes me that there are two possible ways to conceive of the congressional purpose here. And one is Mr. Eisler's way, which is that it was supposed to be a safety valve, it's supposed to allow small refineries that are having difficulty in any given year, it might be this year, it might be 10 years from now, to have a way out. And the alternative story is the one that you just suggested, which is that this is really conduct forcing. It's supposed to be that at some point. So how do we choose between those two different ways of understanding what Congress's purpose is? Sure, Justice Kagan. I mean, I think we do have a better understanding of the purpose. But to start with the structure, I would look at, for example, if you read A1, A2, and B1 together, you really can see this funneling effect. So A creates an exemption for five years, A2 creates a mandatory exemption for two years, and then B1 allows the exemption for an unstated period, but EPA has made it one year. A applies to all small refineries, A1, A2 applies to just the category of refineries identified by the DOE study, and B1 is case by case. So I think if you read the statute that way, it sort of exudes the funneling effect that's consistent with the underlying purpose, which was to change the fuel supply. I think that the DC Circuit's opinion and the Americans for Clean Energy case makes that clear. I think the legislative and executive background makes it clear the statute was enacted at a time when the United States was dependent on foreign oil, and Congress and the President thought it was important to reduce that dependence for national security, economic, and environmental reasons. Thank you, Mr. Michel. Justice Gorsuch? Good morning, Mr. Michel. I'd like to address with you the point I discussed with Mr. Keisler about footnote 6 in his reply brief and whether there's a continuity requirement in A, which might shed some light on whether we think there's a continuity requirement in B. Is he correct that it would be possible for a small refinery to receive an initial two-year exemption in 2008, fall out of, lose that exemption in 2010, but then regain it in 2011? He's not correct as a factual matter, Justice Gorsuch, and that's for a reason I think you may have suggested in your earlier question. The EPA's 2007 regulations, the initial ones implementing this program, defined the relevant calendar year as 2004, and then the 2010 regulations defined the relevant calendar year as 2006. That provision is actually still in the regulations of the 31A of the appendix to our brief. So because they were defined by fixed years, there was no falling in and out of the exemption in the way that... Why wouldn't that have been possible, given that we'd be looking at different years in 04 and 06? Well, as a practical matter, that certainly didn't happen. I understand factually it didn't happen, but conceptually, could it have happened? Yeah, I think it could have happened because EPA, particularly EPA, had interpreted the statute differently, but as a factual matter... No, no, no, just interpret it the way they did. The fact that we're looking at different years, doesn't that at least open the possibility that there might be people falling in and out of the small refinery definition, even under the period they're covered by A, and therefore you might have... At least conceptually, it was possible for there to be some discontinuity. It is conceptually possible, although I think it's probative that EPA ultimately adopted regulations that didn't allow that to happen. It didn't happen. I got it. Okay. All right. And then just to return to a couple of questions, the Chief Justice asked, and I'm curious about, if I understood you correctly, and you're arguing that the ordinary meaning of the structure and the purpose here support your position, but you're not arguing that the text is unambiguous. That's right, Justice Gorsuch. Okay. And so in circumstances like that, we might in another world have applied Chevron, but you're asking us not to do so here, right? Right, because I think that there's nothing to defer to in that there's no agency interpretation of the question presented that you could grant Chevron to. And of course, as one of your recent opinions I think pointed out, it would be atypical to grant Chevron deference to an agency when it no longer holds that position. So part of the reason why you think it would be inappropriate is because it's just a preamble, but you also indicate even if it were applicable, you would disavow Chevron deference in this case, because as you've indicated in the press release, you don't intend to continue to enforce the 2014 regulation. Both of those things, and I would also add, it's not so much even that it's in a preamble, it's that it's also at best an implication in the preamble that doesn't- But even if it were not in the preamble, even if it were absolutely clear, you still would ask us not to apply Chevron. That would be our position, although here I think it's a lot easier because it's not in the rule and it's not even clear in the preamble. Part of the reason why you don't want us to apply it is because it would be a mistake to supply deference when the agency has changed its position. I think that's right. As the court observed in ethics systems, one of the traditional justifications for Chevron is deference to executive officials and requiring accountability. It would be a strange understanding of accountability to defer to an executive interpretation that's not the one the executive has now. Justice Kavanaugh? Thank you, Chief Justice. Good morning, Mr. Mischel. Mr. Keisler's second argument is brief, which is his lead argument today, the argument that the word extension is temporal but does not have to be continuous. Just to set up how I'm thinking about this and then get your response, you admit it's not an unambiguous word. I think Congress uses extension sometimes even when something's lapsed. We have the examples of COVID and other examples. You make a big deal about ordinary usage, but I'll give you three instances in my life where ordinary usage goes the other way from what you say. Sometimes when you're teaching and you have a 5 o'clock p.m. due date for a paper, after the due date, you will get an email entitled extension request. You grant a paper extension afterwards. Or when you use a sports contract example in your brief, but oftentimes if the player signs a new contract, that will be described by most people as a player extends for two more years. Or if you let your print newspaper subscription lapse for a time and then you start it up again, you'll tell your family member or friend, oh, I extended the paper subscription. So I think ordinary usage also, like congressional usage, in my experience at least, doesn't tell us exactly. So how do we break this? And the two things he emphasizes are at any time and that there's no sunset date. So I want to get your responses to that. And then also on the purpose and context, if we get to that to help break what, I don't want to say tie, but to figure out what Congress was thinking about with the word or what it was doing with the word extension, your position is that Congress wanted small refineries to have no outlet at all to essentially go out of business, whereas the other side's position is simply that EPA would have authority, as a matter of separation of powers, authority to grant an exemption if a small refinery had a problem. And it really seems quite implausible to think Congress wanted refineries in that circumstance to go out of business. So if I can get your response on the at any time, no sunset date, and the implausibility of Congress wanting small refineries and EPA having authority. Thanks, Justice Kavanaugh. And I think I can maybe fold in a little bit of your first question too, or comment. I think at any time means exactly what it says, which is that a small refinery can ask for an extension of the exemption at any time, but that doesn't define what an extension of the exemption is. So in Justice Kagan's example, I think if that renter originally had a lease that said you can extend your lease at any time, I don't think it would work to come back five years later and ask for an extension. I think, as my friend said, the landlord would still scratch his or her head. So I think, although I think about 10 days later, so I didn't 10 days later, maybe we should base our decision here on absurd, not absurd, but extreme hypotheticals. They're, they're, they're not absurd. They're extreme though. But like a few days later, you would call that an extension. I think you might, but I think that would be because you were running it back in a sort of non-proton sense to the process. Exactly, exactly. Sure. But I want to make very clear, that's not what the small refineries are asking for here. They had exemptions through 2011 or 2013, respectively. They're asking now for an extension into 2016 or 2017. So it really is Justice Kagan's hypothetical and not the non-proton extension. On the purpose and context, I think if you thought they were going to go out of business, this would be a tougher case. They haven't gone out of business in the past when many small refineries have complied. But of course, the purpose of this program was to drive change in the fuel market. Drive change to the point of driving small refineries out of business? I don't see that anywhere in the text or history. Justice Barrett? Mr. Michel, I want to make sure I have a handle on what you mean by ambiguous. You said a couple of times that the word extension is ambiguous, and I would have thought that by that you mean that it does have several definitions, which we've gone over during argument and in the briefs, if you look in the dictionary. But that in the context of this statute, it's clear which of those definitions are reasonably clear, that there's a better indication of which of those definitions is the right one. Am I understanding your argument correctly? Yeah, I think that's right, Justice Barrett. I don't mean to resist. If the court wants to say that our reading is unambiguously correct, I'm not here to tell you not to say that. I'm just saying I don't think you have to go that far if you don't want to. Well, I mean, I'm going to say unambiguously correct because we're here arguing back and forth about what it might mean. But I Congress was using the word extension when we look at the context, correct? Absolutely. I agree, Justice Barrett. Okay. And as for Congress not plausibly intending to send the small refineries out of business, is it possible that Congress just didn't anticipate that they wouldn't be able to comply, that it just grossly underestimated how easy it would be for small refineries to meet the standards? I actually think they might, if I understand your question correctly, they might have underestimated how easy it would be. As we explained in the brief, it turns out that because of this RIN trading system, small refineries are able to recover the full cost of their compliance because the marginal cost of RFS compliance is priced into the market price for refined fuels. Now, I'm not saying that Congress necessarily would have known that at the time, but as it's turned out, there's very little risk of going out of business because of the way the program has... Well, but they say that they're then at the mercy of the RIN market and it can be very expensive. But putting that aside, let's just posit that what Justice Kavanaugh was saying is right, that your reading would drive some small refineries out of the market. Which way should that cut? I mean, because if we think that Congress might not have anticipated that at the time, what are we to make of that? So I think Congress, of course, included a number of provisions that added flexibility that would keep small refineries from going out of business. But I do want to answer your question directly. I suppose at the end of the day, if 15 years later there were one or two small refineries that couldn't comply because they couldn't find a way after 15 years, I think that Congress would have accepted that outcome because it was trying to change the fuel supply. But I want to stress, I don't think that's what's going to happen in part because of the other safeguards that Congress wrote into the program. Thank you, Mr. Michel. A minute to wrap up, Mr. Michel. Thank you, Mr. Chief Justice. The key statutory provision here has an ordinary common sense meaning. To obtain an extension of the exemption under subparagraph A, a small refinery must have an exemption under subparagraph A. Petitioner's contrary reading is counterintuitive at best. This court typically applies the ordinary meaning of statutory language unless there's a good reason not to, and here there's not. Allowing extensions only for small refineries that maintain an exemption fits with the words and structure Congress adopted, not alternatives it could have chosen instead. The ordinary meaning reflects the statutory goal to drive the market toward renewable fuels while giving small refineries a significant but limited benefit and requiring continued compliance, including with the flexibility that Congress wrote into the RFS, will promote its objectives without causing the harm petitioners fear. The decision below should be affirmed. Thank you, counsel. Mr. Morrison? Mr. Morrison? Mr. Chief Justice, and may it please the court, extension may have other possible meanings in different contexts, but its ordinary meaning to lengthen or prolong is the only plausible meaning in the context of this statutory provision, and petitioners have offered no compelling reason to depart from that ordinary meaning. EPA's authority is therefore limited to prolonging the duration of the exemption under subparagraph A, not creating new exemptions episodically. EPA's unauthorized carve-outs have resulted in billions of dollars of lost revenue to biofuels producers, devastating the rural economies anchored by the renewable fuels industry. Petitioners' suggestion that there should be a permanent safety valve to excuse them from their compliance obligations is belied by the text and structure of the statute and is antithetical to Congress's goal of increasing the volume of renewable fuel in the nation's transportation system. Counsel, can EPA grant an extension of the time to file for an extension? Your Honor, yes. EPA could grant an extension of the time. It does allow a petitioner to file a petition at any time, and that is very broadly worded in the statute. Well, I mean, let's say that the period is due to expire on, you know, January 3rd, and on January 4th, the representative of the refinery comes into EPA and said, here's my application for an extension. Sorry, I'm late. Everybody had COVID. Is EPA going to give him an extension so that, for example, the period wouldn't be continuous? Your Honor, what the continuity we need is between the exemptions or the extensions of the exemptions. The capacious language at any time would, I believe, allow EPA to entertain a petition after December 31st. It would, in a non-prompt manner, revert back and allow continuity in the prior exemption. Well, I don't know why that gives the other side all they need. I mean, right? I mean, you could say they can get an extension if they ask for it, you know, half a year later, right? That's correct, Your Honor. So why couldn't they ask for the extension a year later? They could ask for the extension. I'm sorry. I'm being confused. An extension of the time to apply for an extension. They, Your Honor, what phrase, at any time, they really don't need an extension for the submitting the petition. We take that language at its face value that Congress meant to speak very broadly. The critical thing is that for a refinery to be eligible for an extension in a given compliance year, that refinery has to be exempt for the year preceding the compliance year. Thank you, Counselor. Justice Thomas? Thank you, Mr. Chief Justice. Counsel, just to satisfy my curiosity, what's your interest in a petitioner not receiving this extension? Well, Your Honor, I don't have a personal interest in a petitioner not receiving the client's. Your Honor, it's because it was granted after a lapse in the exemption. There is only one- I understand that, but how does it affect your clients? Your Honor, where there are exemptions given from compliance, that affects the demand for their product. It affects the demand for ethanol, which in turn affects the price of RENs, the price of the fuel that they sell. There have been almost four billion gallons over the last few years that have been lost to small refinery exemptions. That has had a devastating effect on the renewable fuel sector. So your interest is that you are not selling enough ethanol? Is that what I'm hearing? Your Honor, it is that the ethanol that would otherwise be demanded to meet their congressional levels would no longer be produced and provided by the ethanol company, if that's correct. And Congress's objective in achieving those and in making sure under 03 that those levels are ensured to be met by the agency, it's critical that the agency provide those volumes to make sure the statutory levels are met. But your interest is actually in securing the market for your product? Your Honor, it's in making sure that, yes, we are going to be providing ethanol, blending into the nation's transportation system at the levels Congress contemplated in 02 of the statute. Thank you. Justice Breyer? Same question about marketable rights. When you read about the first extension, it doesn't say 2011 and then two more years. It says 2011 and at least two more years. They could have given 50 more years as far as that wording is concerned. And I guess they wouldn't want to do that because things change all the time. You don't know what the price of the RAN will be. No one knows. Sometimes it's up, sometimes it's down. Now, I've just given you an excellent reason why you would lose. Because they want small refineries to not have to do this. And who is a small refinery with disproportionate hardship varies tremendously, possibly, across the years. So what do you point to to show I'm wrong? What do you point to in the legislative history? What do you point to in the context in which this was enacted that says, no, they're not worried about the fluctuating prices and changes. They're worried only on phasing this out. That's your point. What's your strongest evidence? And I do look at the legislative history, if you have some there. All refineries had 15 years to adjust to the levels that ultimately peak in 2022. And they had time gradually, giving them all the time to build the capacity. And that is explained in Senate report number 10974 at 6. Secondly, small refineries had a five-year blanket exemption, plus an additional possible two years to invest or adjust. And thirdly, I would say that the RFS compliance costs, as the government points out, turned out to be recoverable anyway, which would adjust for the fluctuations. If it did become more expensive in a given year, those compliance costs would still be recoverable in the cost of the product sold. And then finally, I would point to the equities of the situation that in 2015, only seven out of 137 refineries were under the exemption. So about 95% of the refineries in the country had complied, were meeting their or making their proportional contribution to the RFS demand. Justice Alito? Justice Alito? Justice Sotomayor? Counsel, I'd like you to finish. I'm sorry, Sam. Go ahead. Let's say there are two refineries. Refinery 1 gets an exemption in year 1 and in year 2, refinery number 2 complies in year 1, but needs an exemption in year 2. And you would say that the second refinery can't get that exemption. Why is that a sensible scheme? Well, Your Honor, I guess that hypothetical rests on the false premise that given small refineries suffering a disproportionate economic hardship might not seek an exemption when it could have. But the truth is that all small refineries have every incentive in the world to apply for an exemption in a timely fashion, because otherwise they'd have to comply. Moreover, once a refinery has developed a mechanism for compliance, it can actually, as I just mentioned, it can actually recover those compliance costs, so there is no disadvantage from one to the other. They also have compliance flexibilities in the nature of deficit carryover, too, if they need so. All right. Thank you. Justice Sotomayor? Counsel, both you and I think the government have said that as the system has churned out, Congress may not have known that the costs were recoverable. Can you explain that? I mean, what is odd about this statute is that there are all sorts of jump-off points away from the statute. The government mentioned a bunch of them. Justice Barrett mentioned one in particular, the regional effect. But there are all sorts of other outs that the EPA can implement. But why would Congress not have anticipated the cost recovery? Your Honor, I believe in 2005 and 2007, Congress did not have the information that it later gleaned and that EPA provided in analyses that it did on the impact of RFS compliance costs to refineries, small and large. The most comprehensive study came in the 2015 EPA report by Berkholder, and there were other similar reports by Nittel and others that basically found that RFS compliance costs were recoverable in the cost of products sold small and large. That information was not available to Congress in 2005 and 2007. And I think that's part of the reason why you don't see you actually have this exemption on the books. It's also true that the Department of Energy, when it first came out with the study in 2008, its initial reaction was that the further extension was not necessary because it began to see what Berkholder saw in later years, that the costs were recoverable. So I think that's right, Justice Sotomayor. If it were the case that Congress could have seen back in 2005 and 2007 what it learned in later years, we might not have any exemption on the record. Thank you, counsel. Justice Sotomayor? Oh, I'm sorry, Justice Kagan. Mr. Morrison, I want to go back to your conversation with the Chief Justice about what at any time means. You said it was quite capacious, but of course you don't think it goes so far as to give Mr. Kaiser what he wants. So could you explain to me what that term means? What does it include and where does it stop? Yes, Justice Kagan. At any time speaks only to the simple procedural question of when a small refinery can submit its petition. It says nothing about the substantive requirements for getting an exemption extended. Congress added that language at any time simply to clarify that small refineries can submit petitions outside of the time-limited provisions in A1 and A2. For example, small refineries can and did submit petitions in 2011 and 2012 when the Department of Energy did include them in its study. And I believe this distinction between the procedural question as we view at any time and the substantive discussion about what's required for an exemption extension is clear from four things in that language. First is the ordinary meaning of may at any time petition. Secondly is the nearest reasonable reference canon of statutory construction, which places at any time next to petition. Third is the undisputedly continuous nature of the adjacent provision in A2. And lastly, the overall purposes of the RFS, which would be undermined by an open-ended and intermittent exemption. Thank you, Mr. Marsden. Justice Gorsuch. I have no questions at this time. Thank you. And Justice Kavanaugh. Thank you, Mr. Chief Justice. Mr. Kaisler said if you win this case, it won't add a drop to the volume of renewable fuel into the market. Do you agree? No, Justice Kavanaugh. We would not agree. We submitted evidence with our briefs that indicate that small refinery exemptions have caused a substantial drop in the price of ethanol, roughly $2.3 billion in losses due to reduced revenues during the recent period, about 162 million gallons. That's in the Richmond Declaration attached to our 10th Circuit brief. I would also point you, Justice Kavanaugh, to the state's amicus filing here, which details the economic harm that has been and will be continued upon the biofuels industry if these exemptions continue. The economic harm is distinct from the volume into the market. I'll let Mr. Kaisler respond to that if there is a response on rebuttal. Another question, picking up on Justice Breyer's questions. It seems like we have a choice whether to interpret this as giving the agency flexibility to give the exemption or kind of a prohibition on granting the exemption. Why, when faced with this kind of provision that doesn't have the kind of sunset language that you would often see, wouldn't we interpret this scheme to the extent there's ambiguity to give the agency flexibility whether to grant exemptions given the hardships that could result? Justice Kavanaugh, I believe we do begin with the ordinary and common meaning of extension. Although there may be other definitions possible, the ordinary and common meaning remains to prolong or enlarge. I think there are three contextual clues that bring us to the fact that this was meant to be a temporary exemption extension. The first is simple language in B1, which limits EPA's authority only to extending the exemption in A1, which Congress said would be temporary and time limited. The second is, in the same way Congress used extension in the rest of Section 211, all throughout the Clean Air Act, when it uses extension, it does prolong continuously the duration of something preexisting. And I do believe, lastly, that if continuity is clear in the words Congress did not choose, that if it had chosen reinstate, restart, renew, or taken the most simple path of just saying that someone could petition for an exemption, that would lend toward a non-continuous interpretation. Thank you. Justice Barrett? Mr. Morrison, I have a question about the word temporary. So it's part of your argument that in context there's a continuity requirement to the word exemption. But so long as they are continuous, can these exemptions go on into perpetuity? Your Honor, theoretically, it is possible that a small refinery could submit a meritorious petition each year that shows it had a disproportionate economic hardship, as long as, again, it was eligible to receive that exemption that year because it had an exemption extension in the preceding compliance year. We think that there's still going to be a funneling effect that would remove that possibility of something indefinite, though. The harm would have to be disproportionate. And again, what we're doing is still extending an exemption that Congress itself said would be time-limited and temporary. Well, if it's not really temporary, however, in the sense that, you know, you're saying that for practical reasons, maybe they would phase out. But as you read the text, as I understand your argument, in any event, as you read the text, there's nothing in the text that stops a small refinery from continually getting exemption year after year. So it seems to me if temporary doesn't really mean temporary, then maybe it doesn't cast as much light as you say on what means either. Your Honor, I think that's part of the reason why temporary was not in the header for B-1, and it was in the header for A, because extensions under B-1 could go on for a period of years. Even though B-1 references back to the initial temporary exemption and a disproportionate economic hardship would create a funneling effect, you're correct that there's no specific limit on the number of continuous extensions that a small refinery may obtain under B. A minute to wrap up, Mr. Morrison. Petitioners have given this court no compelling reason to depart from the ordinary meaning of the word extension, and it should not do so here. The context in which this word is used in the statute confirms that this ordinary meaning is also the only appropriate and plausible meaning. Consequently, any extension of the temporary time-limited exemption for a new compliance year must be preceded by an exemption in the prior compliance years. The statute's purpose of enhancing energy security through the increased production of biofuels further precludes petitioners' assertion that a compliance exemption Congress provided only on a temporary basis could become permanent. We therefore ask that you affirm the Tenth Circuit's decision on this issue. Thank you, counsel. Rebuttal, Mr. Keisler. Thank you, Mr. Chief Justice. Both of my friends assert as if it were a matter of fact that we can simply recover the costs of this program by raising our prices. We can't. In the applications we submitted to the EPA, we said that our margins in many cases were zero or negative once the costs of this program were taken into account, and this cost is the single largest operating cost we have. But we don't want the court to decide as a factual matter whether we can pass through these costs or not. We're just asking the EPA to look at that evidence as part of our submission, but of course they won't if, for this entirely irrelevant issue of continuity, they don't get to consider our applications at all. And the issue of continuity doesn't depend on whether we're right or they're right about whether or not these costs can be passed through. Now my friend from the government began by saying that this won't doom small refineries to go out of business, but the key point is that if he's wrong about that, and if it did, he's saying that EPA's hands are tied and that Congress meant EPA's hands to be tied and never meant it to be able to grant relief even in that circumstance. Instead it meant that we would be funneled out of the market. These are the realities that we explained in our applications. Many small refineries, as Congress recognized, cannot afford the blending infrastructure, and so they have to rely on the marketable rights, the credits and the RINs, and as everyone has acknowledged, the prices for those are wildly volatile. And Department of Energy found that having to pay those costs will constitute disproportionate economic hardship when those costs exceed the The price of these credits can jump up and down as much as four or five times or more in a single year. So if they plummet one year and we can comply, we are then completely foreclosed from relief in every future year, even if they go up 10 times. And also, if somebody somehow gave us the blending infrastructure for free at our facility, that would not solve the issues we That's why they wrote this whole separate subsection about small refineries. Many of these refineries are located in geographically remote areas. They depend on pipelines to reach their markets, and pipelines don't take blended fuel because it's corrosive to pipelines. They don't own retail gas stations like their larger competitors. They can't compel the gas stations to take their blended fuel, and the gas stations often don't. And they have to sell a larger proportion in the rest of the industry of diesel because they're in remote areas, and diesel doesn't take blending to the same degree as the others. So there are all sorts of reasons why Congress understood that small refineries needed this different provision, and that's why they authorized them to seek relief at any time based on hardship. Thank you, counsel. The case is submitted.